UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

TYRONE B. HENDERSON, SR. and
CAROLYN WITT, on behalf of themselves
and all others similarly situated,

               Plaintiffs,

     v.

ALLIEDBARTON SECURITY SERVICES
LLC, d/b/a HR PLUS,

               Defendant.

Case No. 3:14-cv-00082-REP

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT ON COUNT I OF PLAINTIFFS' COMPLAINT**

Defendant ALLIEDBARTON SECURITY SERVICES LLC d/b/a HR Plus

("AlliedBarton" or "Defendant"), incorrectly named as HR Plus in Plaintiffs' Complaint,

pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56, submits this Memorandum of Law in

Support of Its Motion for Summary Judgment on Count I of Plaintiffs' Complaint.[1]

## INTRODUCTION

The plain language of § 1681k(a) of the Fair Credit Reporting Act ("FCRA") requires

dismissal of Count I of Plaintiffs' Complaint. In Count I, Plaintiffs Tyrone Henderson and

Carolyn Witt ("Plaintiffs") allege that Defendant violated § 1681k(a) when it reported

information about their criminal history without notifying Plaintiffs at the time it processed their

reports. The FCRA does not impose such a requirement. Section 1681k(a) requires that a

consumer reporting agency ("CRA") *either*: (1) notify the consumer that it is reporting public

---

[1] The parties have agreed that there are no disputed issues of material fact and that summary judgment should be decided on the facts set forth in their contemporaneously-filed Joint Stipulation of Facts for Purposes of Defendant's Motion for Summary Judgment on Count I of Plaintiffs' Complaint (referenced herein as "Stipulated Facts ¶ __"). The Stipulated Facts are set forth below at pages 4-15.

record information about the consumer that is likely to have an adverse effect; *or* (2) "maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date." 15 U.S.C. § 1681k(a)(1-2).  In accordance with the plain language of the section, Defendant maintained strict procedures designed to ensure that, whenever it reported adverse criminal public record information, such information was complete and up to date.  Plaintiffs have not alleged and cannot demonstrate that Defendant failed to meet such requirement.

Rather than contest this bedrock principle, Plaintiffs apparently intend to argue that Defendant cannot comply with § 1681k(a)(2) because Defendant did not – or, in many jurisdictions, cannot – obtain the social security number, address, and other information of the consumer.  In essence, Plaintiffs will argue that, notwithstanding the express language of the statute, no CRA – not just Defendant – is ever capable of preparing a "complete" report that contains criminal history on any consumer without having every possible individual identifier for that person.  The Stipulated Facts were negotiated and designed to allow the parties to brief, and for the Court to consider, Plaintiffs' novel theory.  All that remains is a question of law for this Court.  Plaintiffs' theory fails for several reasons.

As an initial matter, Plaintiffs failed to plead what they now assert as their primary theory of liability.  Indeed, in Count I of the Complaint, Plaintiffs assert a claim only under § 1681k(a)(1).  In that Count, Plaintiffs allege that Defendant violated § 1681k(a)(1) because it did not notify them that it was reporting public record criminal history information about them at the time that it reported the information.  Because Plaintiffs did not allege that Defendant failed to comply with § 1681k(a)(2) by maintaining strict procedures, let alone the facts in support of such a theory, Plaintiffs should not be allowed to introduce a new theory at this late stage of the case.

Second, the Stipulated Facts confirm that Defendant nonetheless followed the "strict procedures" requirement set forth in § 1681k(a)(2).  As mentioned above, under § 1681k(a)(2), a CRA that furnishes consumer reports for employment purposes must maintain "strict procedures" designed to insure that, whenever adverse public record information is reported, such information is complete and up to date.  Defendant complied with this requirement by adopting and exercising detailed procedures to ensure that, when it reported items like arrests and convictions, such information was complete and up to date.

Third, by its plain language, § 1681k(a)(2) does not require a CRA to ensure the completeness of non-reported information or to ensure the accuracy of its report.  Interpreting § 1681k(a)(2) to impose such requirements would render other portions of the FCRA superfluous.  There is no need to rewrite § 1681k(a)(2) to require a CRA to ensure that the information that it reports pertains to the individual in question because a different section of the FCRA – 15 U.S.C. § 1681e – specifically addresses that topic.  Under § 1681e(b), whenever a CRA prepares a consumer report, "it shall follow reasonable procedures to assure *maximum possible accuracy* of the *information concerning the individual about whom the report relates*."  Plaintiffs have asserted a separate count alleging violations of § 1681e(b) that is not the subject of the instant motion.  Plaintiffs' argument incorrectly attempts to conflate these two distinct sections.

Fourth, the legislative history of § 1681k(a) supports its plain language.  As explained further herein, in passing § 1681k(a)(2), Congress sought to ensure that, when reporting criminal history, CRAs report the final disposition of arrests and other adverse events.  In other words, consistent with the plain terms of the statute, Congress sought to ensure that information "likely to have an adverse effect upon a consumer's ability to obtain employment," like arrests and convictions, included their final dispositions.  The FTC similarly has confirmed that § 1681k(a)(2) requires only that each item of criminal public record information that a CRA

reports is complete and up to date; "[f]or example, if the CRA reports an indictment, it must also report any dismissal or acquittal available on the public record as of the date of the report."

Accordingly, for these numerous reasons, Defendant is entitled to summary judgment on Count I of Plaintiffs' Complaint.[2]

## JOINT STIPULATION OF UNDISPUTED MATERIAL FACTS

### Background

1.      This Court has jurisdiction over the subject matter of Plaintiffs' claims and venue is proper in the district.

2.      From the beginning of the purported Class Period (February 2, 2009) through September 30, 2013, Defendant AlliedBarton Security Services ("AlliedBarton") operated a division named HR Plus, which operated as a consumer reporting agency under the Fair Credit Reporting Act ("FCRA").  AlliedBarton d/b/a HR Plus performed consumer background checks for the purpose of furnishing consumer reports to third parties for employment purposes. Effective September 30, 2013, AlliedBarton sold HR Plus through an asset purchase agreement with Sterling Infosystems, Inc.

### Plaintiff Tyrone Henderson

3.      Plaintiff Tyrone Henderson is a resident of Richmond, Virginia.  On October 1, 2009, Performance Food Group requested that HR Plus prepare a consumer report on Henderson for an employment purpose.

4.      To perform the background search, Performance Food Group provided HR Plus

---

[2] Defendant separately is entitled to summary judgment based on the sheer novelty of Plaintiffs' § 1681k(a)(2) theory.  Under the Court's scheduling order, the issue of whether Defendant's alleged conduct constituted a "willful" violation of the law under the Supreme Court's guidance in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007) is deferred until Phase II.  However, based on the complete absence of support for Plaintiffs' theory, if necessary, Defendant separately will move for summary judgment on that basis.

information identifiable to Henderson, including his full birth date (month, day, and year of birth), social security number, address, and his first, and last name.

## National Criminal Database (Henderson)

5.      In preparing Henderson's report, HR Plus followed its Standard Operating Procedures.  First, HR Plus provided Henderson's identifying information to CoreLogic National Background Data ("NBD"), a provider of wholesale consumer report information.  The National Criminal Database search returned information about criminal records belonging to an individual named "Tyrone Henderson" with the same full date of birth (month, date, and year) and the same first and last name as Plaintiff Henderson.

6.      The records returned by NBD did not contain a social security number.

7.      The criminal records provided by NBD as matched to Plaintiff Henderson were from Westmoreland County, Pennsylvania and Richmond County, Virginia.

8.      HR Plus furnished the NBD results within its report to Performance Food Group under the heading, "National Criminal Database" after those records were also located at the county level.  Consistent with its Standard Operating Procedures, because it did not receive a social security number from NBD or at the county level, HR Plus did not include a social security number associated with the criminal public records in this section of its report.

## Pennsylvania Criminal Records

9.      Consistent with its Standard Operating Procedures, HR Plus also performed additional review of the NBD Pennsylvania records that it matched to Plaintiff Henderson.

10.     Specifically, for the Westmoreland County, Pennsylvania records, HR Plus personnel went to the Pennsylvania Unified Judicial System Web Portal to research the records that had been provided by NBD.

11.     The Pennsylvania Unified Judicial System website used by HR Plus to obtain the

Westmoreland County, Pennsylvania records does not provide the social security number associated with the criminal records viewable through the website.

12.     HR Plus personnel found records that had the same first name and same last name and full date of birth as Plaintiff Henderson.  For each of the matching records, HR Plus personnel also obtained the offense, filing, and disposition dates; the level of offense; the type of offense; the disposition; and sentencing information.

13.     These records did not include a social security number.

14.     The information obtained from the Pennsylvania Unified Judicial System website is attached as Exhibit "A," Defendant's Bates numbers 387-407.

### Virginia Criminal Records

15.     Consistent with its Standard Operating Procedures, HR Plus also performed additional review of the NBD Virginia records that were matched to Plaintiff Henderson.  HR Plus personnel reviewed the information received from those searches and the information received from NBD.  This included obtaining the filing and disposition dates; the level of offense; the type of offense; the disposition; and sentencing information.

16.     First, for records from the Circuit Court for the City of Richmond, Virginia, HR Plus personnel used the website for the Virginia Judicial System's Case Management System ("CMS") to research the record that had been provided by NBD.

17.     HR Plus personnel also reviewed the CMS website to search for records in Goochland County, Virginia and Orange County, Virginia.  None were found.

18.     This website is maintained by the Office of the Executive Secretary of the Supreme Court of Virginia ("OES").

19.     The Virginia CMS used by HR Plus does not provide the social security number associated with the criminal records viewable through the website.

20.     The information obtained from the CMS for the City of Richmond record is attached as Exhibit "B," Defendant's Bates numbers 385-386.

21.     In connection with Henderson's report, HR Plus also used third party record retrievers to go directly to other county court clerk's office to retrieve information.  HR Plus' external vendor Innovative Enterprises, Inc. went directly to the county clerk offices of Chesterfield County, Virginia and Henrico County, Virginia to retrieve information.  No records were found.

### North Carolina Criminal Records

22.     HR Plus' external vendor Corredor Corporation, was hired by HR Plus to research the Wake County, North Carolina records provided by NBD.

23.     HR Plus understands that Corredor Corporation accessed the county clerk offices of Wake County, North Carolina records to retrieve information. No record was found in this search.

### Consumer Report to Performance Food Group

24.     After researching the criminal record information about Plaintiff Henderson, HR Plus completed its consumer report on Plaintiff Henderson on October 6, 2009.  The consumer report HR Plus furnished to Performance Food Group is materially the same as that attached as Exhibit "C,"  Defendant's Bates numbers 1-8.

25.     In accordance with HR Plus' Standard Operating Procedures, the Henderson report contained different sections.  The sections that pertained to criminal records included a listing of individual criminal records found or counties searched, a section listing results of a Sex Offenders search and a section titled, National Criminal Database, and how each record was matched to Henderson.

26.     In Henderson's consumer report, HR Plus reported the county records by

identifying the counties where the criminal records were located and providing the specific case numbers for the court files containing the reported information, as well as how it determined that each case was matched to Plaintiff Henderson.

27.     Henderson's report listed four records from Westmoreland County, Pennsylvania and included the following information: (1) "Manufacture/Deliver/Possess with Intent Manufacture or Deliver," a felony conviction record with the case number CP-65-CR-0004581-2004; offense date of September 13, 2004; filing date of October 28, 2004; conviction date of January 17, 2006; and information and dates relating to sentencing; (2) "Forgery - unauthorized act in writing," a felony record with the case number CP-65-CR-0000541-2007 for a charge that was dismissed on March 23, 2007; offense date of January 15, 2007; and filing date of February 6, 2007; (3) "Theft by unlawful taking - movable property," a misdemeanor record with the case number CP-65-CR-0000541-2007 for a charge that was dismissed on March 23, 2007; offense date of January 15, 2007; and filing date of February 6, 2007; and (4) "Theft by unlawful taking - movable property," a misdemeanor conviction record with the case number CP-65-CR-0000541-2007; offense date of January 15, 2007; filing date of February 6, 2007; conviction date of March 23, 2007; and information and dates relating to sentencing.

28.     HR Plus's report of the Westmoreland County record did not include an associated social security number.

29.     Exhibit "D," is the record regarding the Tyrone Henderson conviction from the Westmoreland County court as of February 12, 2010.

30.      Henderson's report also listed a felony conviction from the City of Richmond, Virginia for "Habitual Offender" with the case number CR8901245F-00, a filing date of December 11, 1989, a disposition date of January 3, 1990, and information relating to sentencing.

31. HR Plus's report of this City of Richmond record did not include an associated social security number.

32. HR Plus did not notify Henderson of the fact that public record information was being reported by the consumer reporting agency, together with the name and address of the person to whom such information was being reported, at the time such public record information was reported by HR Plus to Performance Food Group.

**Plaintiff Carolyn Witt**

33. Plaintiff Carolyn Witt is a citizen of Virginia Beach, Virginia. On February 22, 2012, CMA CGM, Inc. requested that HR Plus prepare a consumer report for an employment purpose regarding Witt.

34. To perform the background search, CMA CGM provided Witt's identifying information, including her full birth date (month, date and year of birth); her city of residence; her social security number; her first, middle and last name and other last names previously used by Witt, including Barnes (her maiden name), Gaudet and Kidd.

**National Criminal Database (Witt)**

35. In preparing Witt's report, HR Plus followed its Standard Operating Procedures. First, HR Plus provided Witt's identifying information to NBD. The National Criminal Database search returned information about criminal records belonging to an individual named "Carolyn Barnes" (Plaintiff's maiden name) with the same day of birth and month of birth, same first name and Witt's maiden name, "Barnes," and the same city of residence as Plaintiff Witt.

36. The records returned by NBD did not contain Witt's social security number.

37. The criminal records provided from NBD about Plaintiff Witt were from the City of Norfolk, Virginia and the City of Virginia Beach, Virginia.

38. HR Plus furnished the NBD results within its report to CMA CGM under the

heading, "National Criminal Database," after those records were also located at the county level. HR Plus did not include a social security number or address associated with the criminal public records in that section of its report.

### Virginia Criminal Records

39.     Consistent with its Standard Operating Procedures, HR Plus also performed additional review of the NBD Virginia records that it matched to Plaintiff Witt.

40.     HR Plus personnel used the website for the Virginia Judicial System's Case Management System ("CMS") to research the record that had been provided by NBD in the City of Norfolk, Virginia and the City of Virginia Beach, Virginia.

41.     The Virginia CMS used by HR Plus does not provide the social security number associated with the criminal records viewable through the website.

42.     The information obtained from the CMS for the City of Norfolk record is attached as Exhibit "E," Defendant's Bates numbers 424-441.

43.     The information obtained from the CMS for the City of Virginia Beach record is attached as Exhibit "F," Defendant's Bates numbers 408-423.

44.     The Virginia CMS used by HR Plus does not provide the social security number, associated with the criminal records viewable through the website.

45.     HR Plus personnel found records that had the first name Carolyn and the last name Barnes, the day of birth and month of birth and the same city of residence as Witt, Virginia Beach, Virginia.  For each of the matching records, HR Plus personnel also obtained the offense, arrest, and disposition dates; the level of offense; the type of offense; the disposition; and sentencing information.

46.     In connection with Plaintiff Witt's report, HR Plus personnel also used third party RapidCourt to conduct an automated search online directly with the Virginia court system using

the same CMS system.  RapidCourt's automated search confirmed the same information

matched by HR Plus to Witt from the City of Norfolk, Virginia and the City of Virginia Beach,

Virginia.  This information included offense and arrest dates; level of offenses; type of offenses;

disposition of offenses; and sentencing information.

### Consumer Report to CMA CGM

47.     After researching the criminal record information about Plaintiff Witt, HR Plus

completed its consumer report on Plaintiff Witt ordered on February 22, 2012.  The consumer

report HR Plus furnished to CMA CGM is materially the same as that attached as Exhibit "G,"

Defendant's Bates numbers 57-65.

48.     In accordance with HR Plus' Standard Operating Procedures, the Witt report

contained different sections.  The sections that pertained to criminal records included a listing of

individual criminal records found or counties searched and a section titled, National Criminal

Database.

49.     Witt's report listed eight felony conviction records from Virginia Beach, Virginia

for Case Number CR00001883-00.  The report identified the offense date (February 19, 2000);

arrest date (February 24, 2000); conviction date (January 30, 2001); and information and dates

relating to sentencing.  The eight felony conviction records identified on the report included five

counts of "Abduction," one count of "Robbery," one count of "Use of a Firearm;" and one count

of "Conspiracy."

50.     Witt's report also listed four felony conviction records from Norfolk City,

Virginia for Case Number CR00003393.  The report identified the offense date (December 19,

1998); arrest date (June 10, 2000); filing date (August 2, 2000); and information and dates

relating to sentencing.  The four felony conviction records identified on the report included one

count of "Robbery;" one count of "Grand Larceny;" one count of "Conspiracy to Commit

Felony;" and one count of "Use Firearm to Commit Felony."

51.     HR Plus's report of these records in paragraphs 49 and 50 did not include and associated social security number.

52.     Exhibit "H," is the record regarding the Carolyn Barnes conviction from the City of Virginia Beach court as of October 8, 2014.

53.     Exhibit "I" is the record regarding the Carolyn Barnes conviction from the City of Norfolk court as of October 8, 2014.

54.     In Witt's report, HR Plus also listed and provided the public records it had received from NBD after those were also located at the county level.  HR Plus's report of these NBD records did not include a social security number.

55.     HR Plus did not notify Witt of the fact that public record information was being reported by the consumer reporting agency, together with the name and address of the person to whom such information was being reported, at the time such public record information was reported by HR Plus to CMA CGM.

### HR Plus's Relevant Procedures

56.     From February 2, 2009 through September 30, 2013, HR Plus also consistently followed its Standard Operating Procedures when preparing consumer reports regarding individuals other than Plaintiffs Henderson and Witt.  These procedures are contained in the HR Plus Standard Operating Procedures Manual.  These procedures are contained in Exhibit "J." These procedures are described in the following paragraphs.

57.     After receiving a request for a consumer report that included a request for a national database search, HR Plus would first perform a national database search through one of its vendors.  From February 2, 2009 to early 2012, HR Plus used NBD as its primary provider of a national criminal database search.  From early 2012 to September 30, 2013, HR Plus used

RapidCourt as its primary provider of a national criminal database search.   If the national

criminal database search did not result in any records for a particular consumer, no criminal

records were reported unless they were searched specifically at the county of record as a

different service offering.

58.     If after receiving NBD results illustrating that a particular consumer was matched

to a criminal record, HR Plus personnel would proceed to research the information by either

internally researching online court records or contracting with a third party researcher to research

court records at the county were the criminal record originated.  HR Plus personnel followed

Standard Operating Procedures to research all information received from the national database

search.

59.     In the event a national criminal database search indicated a public record where

the original source (*i.e.*, county of record) could be searched by an online search repository, HR

Plus personnel would search the online repository to pull the record as currently available online.

HR Plus personnel would match any record by at least two personal identifiers as set forth in its

Standard Operating Procedure Manual.  If HR Plus could not verify that the record matched the

consumer, by at least two personal identifiers, the record would not be reported.   If the record

did not satisfy these and other procedures for matching in accordance with its Standard

Operating Procedures Manual, HR Plus would not report the record.  HR Plus would record the

current status of the record from the online repository in order to try and ensure that the

information received was up to date.  At a minimum, HR Plus would capture the following

information: arrest or filing date; the level of offense; the type of offense; the disposition; and

information relating to sentencing.

60.     In most instances, but not always, HR Plus did not receive social security

numbers for the public records it researched through these online repositories.

61.     Beginning in 2011, HR Plus began using RapidCourt as a vendor. HR Plus began using RapidCourt only for social trace information and then as a record researcher.  It was not until January 2012 that HR Plus began using RapidCourt as a national criminal database search. It is HR Plus' understanding that when HR Plus used RapidCourt as a court researcher, RapidCourt would pull information from county repositories available on the Internet through webscraping technology, and other computer logarithms to provide the most up to date information that the Court published online.

62.     When using RapidCourt as a record researcher, HR Plus personnel would independently review all records received from RapidCourt in accordance with its Standard Operating Procedures Manual.  If, based on that review and in accordance with its Manual, there were any concerns or questions regarding the information received from RapidCourt, HR Plus personnel would, in those instances, personally contact the public record source and/or conduct an independent search of the public record source's online repository to further confirm that a criminal record match was an accurate reflection of the current public record at the time and included all of the data fields that were required by HR Plus policy.

63.     For a record to be reported, HR Plus required specific minimum fields that had to be completed, including at least one date stating either the offense, arrest or filing date; if there was a conviction on file for the case or if it was an open matter; level of offense; the type of offense; and a description of sentencing information unless sentencing had not occurred.

64.     Sometimes HR Plus employees would perform additional research including contacting the court clerk for a record to obtain more information.  This was not done in the matters of Henderson and Witt.

65.     In most instances, but not always, HR Plus did not obtain the social security number associated with a criminal court record.  The lack of information or match of information

regarding the social security number was notated on the consumer report.

66.     In the event a national criminal database search identified a public record that originated from a source that did not have an online repository or electronic search capability, HR Plus personnel would contact one of its previously salted and vetted third-party vendors to personally travel to the court or other public record source location to obtain the record maintained by that court.  HR Plus' vendors differed by the location of the public record source.

67.     Depending on the vendor, the information provided to HR Plus would be in the form of print-outs from the public record source or through summaries of the information collected.  In all instances where a third-party vendor was used, the vendor was required to follow the different trails of information to confirm that each particular criminal record match was the current public record maintained by the court and that the minimum fields discussed above were provided.

68.     It was HR Plus' Standard Operating Procedure that HR Plus did not notify consumers of the fact that public record information was being reported by the consumer reporting agency, together with the name and address of the person to whom such information was being reported, at the time such public record information was reported by HR Plus to the employer.

<u>**STANDARD OF REVIEW**</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "The Supreme Court has construed Rule 56(c) to 'mandate the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the

burden of proof at trial.'" *Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 850, 855 (E.D. Va. 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial." *Williams v. Telespectrum, Inc.*, No. 05-853, 2006 WL 7067107, at *1 (E.D. Va. Nov. 7, 2006), *report and recomm. adopted* Dkt. No. 40 (E.D. Va. Jan. 9, 2007) (Payne, J.).

## ARGUMENT

### I. PLAINTIFFS CANNOT DEMONSTRATE THAT DEFENDANT FAILED TO COMPLY WITH FCRA § 1681k(a).

#### A. Plaintiffs Fail To Allege Any Violation Of § 1681k(a)(2).

Under the FCRA, 15 U.S.C. § 1681k(a), a CRA that compiles and reports items of information on consumers "which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment" must satisfy *one* of the following two subsections:

> (1) at the time such public record information is reported . . . notify the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported; *or*

> (2) maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date. For purposes of this paragraph, items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported.

15 U.S.C. § 1681k(a) (emphasis added).

Under its clear terms, the statute provides two separate and independent options for compliance: A CRA subject to its requirements *either* may: (1) send the notice identified in subsection (1); *or* (2) maintain "strict procedures" designed to ensure that, whenever it reports adverse public record information, the matters are "complete and up to date," as identified in subsection (2). *See Dalton v. Capital Assoc. Indus., Inc.*, 257 F.3d 409, 417 (4th Cir. 2001)

(recognizing that a CRA is obligated to do "one of two things" under § 1681k(a)); *Henderson v. InfoMart, Inc.*, No. 14-cv-1609, Dkt. No. 59 at \*\*16-17 (N.D. Ga. Aug. 15, 2014), *report and recomm. adopted*, Dkt. No. 61 (N.D. Ga. Sept. 2, 2014) (attached as Exhibit 1) (holding that, under § 1681k(a), plaintiff must show violation of *both* subsection (1) and (2) of the statute).

To meet pleading requirements and put Defendant on notice of a claim for violation of § 1681k(a)(2), Plaintiffs must state facts that explain how "Defendant allegedly engaged in the challenged conduct." *Smith v. HireRight Solutions, Inc.*, 711 F. Supp. 2d 426, 438 (E.D. Pa. 2010). In Count I of their Complaint, Plaintiffs allege that Defendant violated the FCRA by failing to provide the notice required under § 1681k(a)(1). (Compl. ¶¶ 46-57).[3] Plaintiffs do not allege that Defendant violated § 1681k(a)(2). Indeed, Plaintiffs' sole conclusory allegation regarding that section appears in Paragraph 41:

> On information and belief, Plaintiffs allege that Defendant did not attempt for any consumer to follow the option available at 15 U.S.C. § 1681k(a)(2), which requires a consumer reporting agency to actually contact the original source of public records information (e.g. the Court clerk) immediately before furnishing a report which includes such information to furnish other than incomplete public records lacking all necessary information. Title 15 U.S.C. § 1681k(a)(2) is thus inapplicable to the consumer reports at issue in this case.

(Doc. No. 1 ¶ 41.) Although Plaintiffs refer to § 1681k(a)(2) in their Complaint, they do so only to misstate its plain meaning and they do not allege how Defendant supposedly failed to comply.

In *InfoMart*, Plaintiffs alleged – and the court rejected – an *identical* paragraph. First, the court held that Plaintiffs misstated the law: "The FCRA does not define 'strict procedures,' and while it does require heighten[ed] standards in the collection of information, it does not require that a consumer reporting agency contact the 'original source' of public records information 'immediately before furnishing a report' as Plaintiffs suggest." *InfoMart*, No. 14-cv-1609, Dkt.

---

[3] Defendant does not dispute that it did not provide the notice contemplated in § 1681k(a)(1). (Stipulated Facts ¶¶ 32, 55, 68). Rather, as explained in detail, Defendant complied with § 1681k(a) by following the compliance option set forth in subsection (2) of the section.

No. 61, Ex. 1 at **18-19.  Second, in any event, the *InfoMart* court held that, as here, Plaintiffs failed to provide any "specific factual content plausibly suggesting that Defendant failed to follow strict procedures."  *Id.*  As in *InfoMart*, because Plaintiffs never pleaded a Count for violation of § 1681k(a)(2), they should not be entitled to pursue such a claim here.

**B.      Plaintiffs Cannot Demonstrate That Defendant Failed To Maintain "Strict Procedures."**

In any event, even if Plaintiffs can proceed with a claim they did not plead, they cannot show that Defendant failed to comply with § 1681k(a)(2).  To establish a violation of the requirements of § 1681k(a)(2), a plaintiff must show that:  "[1] the CRA failed to maintain strict procedures designed to insure that the information in that report was complete and up to date; and [2] the consumer report was either incomplete or not up to date."  *Farmer v. Phillips Agency, Inc.*, 285 F.R.D. 688, 695 (N.D. Ga. 2012).  As the Stipulated Facts demonstrate, Plaintiffs cannot make either showing, and any § 1681k(a)(2) claim fails as a matter of law.

First, Defendant maintained and followed detailed, comprehensive procedures to ensure that public record information that it reported that was likely to have an adverse effect on a consumer's ability to obtain employment was "complete and up to date."  As set forth in the undisputed Stipulated Facts, for both Henderson and Witt, Defendant followed its Standard Operating Procedures.  (Stipulated Facts ¶¶ 5, 35).  Defendant performed a national database search through CoreLogic National Background Data ("NBD"), a provider of wholesale criminal history information.  (*Id.* ¶¶ 4-5, 7, 34-35, 37).  After NBD returned public criminal records regarding Plaintiffs, and before reporting anything to an end user, Defendant confirmed the existence of and specific details relating to the criminal records located through the database search by researching and obtaining the same criminal records directly from the city and county public record sources.  (*Id.* ¶¶ 8-12, 14-16, 38-40, 42-43, 45-46).  Before reporting any criminal charges or convictions to Plaintiffs' prospective employers, Defendant conducted an additional

review of the records to ensure that they did not contain any discrepancies and that the information reported met a minimum of specific data fields, including the arrest or filing date; the level of offense; the type of offense; the disposition; and any information relating to sentencing.  (*Id.* ¶¶ 9, 15, 24, 39, 45, 47).

Defendant similarly followed its Standard Operating Procedures with respect to the reports it prepared for all other consumers. (Stipulated Facts ¶¶ 56-67).  As with Plaintiffs, upon receiving a request for a consumer report, Defendant first performed a national database search. (*Id.* ¶ 57).  If that search returned a criminal record for a particular consumer, Defendant confirmed the existence of the public records by researching online court records or by contracting with a third party researcher to obtain court records directly from the county where the criminal record originated.  (*Id.* ¶¶ 58, 66).  At a minimum, before reporting a record, Defendant (or a third-party researcher with whom Defendant contracted) recorded the arrest or filing date; the level of offense; the type of offense; the disposition; and any information relating to sentencing.  (*Id.* ¶¶ 59, 63, 66).  If there was any missing information in a particular record, Defendant contacted the court clerk directly to obtain more information.  (*Id.* ¶¶ 62, 64).

Defendant's maintenance of and compliance with its Standard Operating Procedures easily satisfies its obligation to "design strict procedures" to ensure that particular public record information that it reports is "complete and up to date."  *See Moore v. First Advantage Enterprise Screening Corp.*, No. 12-792, 2013 WL 1662959, at *6 (N.D. Ohio April 17, 2013) (finding that, despite an error on plaintiff's report, the defendant satisfied the requisite "strict procedures" by performing a national database search, confirming the existence of public records located through the database search, and personally contacting the public record source when

there was any known discrepancy).[4]

Second, in the cases of the two named Plaintiffs, they cannot demonstrate that the adverse

public record information that Defendant reported was not "complete and up to date."  For each

of the items it reported for Henderson and Witt, Defendant obtained the offense, filing, and

disposition dates; the level of offense; the type of offense; the disposition; and the sentencing

information from court records.  (Stipulated Facts ¶¶ 12, 14, 25, 45, 46).  Defendant further

reported the current public record status of each item (which is the definition of "up to date" in

§1681k(a)(2)), and identified the specific public records available with respect to each of the

matters it reported.  (*Id.* ¶¶ 27, 30, 49, 50).

Through its Standard Operating Procedures, Defendant "design[ed] strict procedures" to

ensure that items of public record information that it reported were "complete and up to date"

and, in fact, the criminal history that it reported for Plaintiffs was "complete and up to date."

Accordingly, as a matter of law, Plaintiffs cannot show that Defendant failed to satisfy

§ 1681k(a)(2).  Thus, Defendant is entitled to summary judgment on Count I.

## II.   SECTION 1681k DOES NOT REQUIRE A CRA TO REPORT PERSONAL INFORMATION OR TO ENSURE ACCURACY.

Faced with the insurmountable hurdle of Defendant's "strict procedures" and painstaking

efforts to identify and report complete information about each piece of criminal history likely to

have an adverse effect on employment, Plaintiffs attempt to create ambiguity where there is none.

Plaintiffs apparently intend to argue that § 1681k(a)(2) required Defendant to ensure that its

report was "complete" by including the entirety of all public record information or all

information identifiable to a particular consumer.  The plain language of § 1681k(a)(2) does not

---

[4] Plaintiffs' assertion in Paragraph 41 of the Complaint that a CRA is required in all instances to "actually contact the original source of public records information" finds no support in the statute or case law.  *Moore*, 2013 WL 1662959, at *6; *InfoMart*, No. 14-cv-1609, Dkt. No. 61, Ex. 1 at *18-19.

support such an interpretation.  Although the FCRA does not specifically define the term

"complete," § 1681k(a)(2) does set forth what must be complete – *i.e.*, items that Defendant

reports that are likely to have an adverse effect on a consumer's ability to obtain employment, in

this case, the records of criminal history -- and the manner by which that information must be

complete – *i.e.*, by including the full record of arrests, indictments, convictions, and the like,

including any disposition information.  Section 1681k(a)(2) does not require a CRA to obtain or

report all information available in the public record and it does not require a CRA to ensure the

accuracy of information regarding the individual about whom the report relates.

A.      **Section 1681k(a) Only Requires That CRAs Report "Complete" Information About Items They Report That Are Likely To Have An Adverse Effect On Employment.**

Section 1681k(a) applies to CRAs that "furnish[] consumer report[s] for employment

purposes and which for that purpose compile[] and report[] items of information on consumers

which are matters of public record and are likely to have an adverse effect upon a consumer's

ability to obtain employment."  15 U.S.C. § 1681k(a).  The section requires such CRAs to follow

certain procedures.  According to § 1681k(a)(2), such CRAs must:

> maintain strict procedures designed to insure that whenever *public record
> information which is likely to have an adverse effect on a consumer's ability to
> obtain employment is reported it* is complete and up to date.  Items of public
> record relating to arrests, indictments, convictions, suits, tax liens, and
> outstanding judgments shall be considered up to date if the current public record
> status of the item at the time of the report is reported.

15 U.S.C. § 1681k(a)(2) (emphasis added).  In other words, CRAs must maintain strict

procedures designed to insure that the information they choose to report regarding items like

arrests, indictments, and convictions is "complete and up to date."  *Id.*

Here, the "public record information" at issue and likely to have an adverse effect on

employment are criminal charges and convictions.  Plaintiffs contend that, despite its plain

language, § 1681k(a)(2) somehow requires CRAs to ensure that their "reports"  are "complete"

by including other information about the consumer.  The section does not require procedures designed to ensure that a "report" is "complete"; rather, it requires procedures designed to ensure that the *criminal charges and convictions being reported* are "complete."  Plaintiffs assert that Defendant cannot possibly comply with § 1681k(a)(2) because it cannot possibly report all public record information.[5]  Plaintiffs base their argument on a fundamental distortion of the statutory text.

To determine the requirements of § 1681k(a) and § 1681k(a)(2), a court must start with the plain and unambiguous language of the statute.  *See Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms."); *WiAV Solution LLC v. Motorola, Inc.*, 732 F. Supp. 2d 634, 639 (E.D. Va. 2010) (Payne, J.) ("Statutory interpretation begins with the plain language of the statute. . . . When there is no ambiguity in a statute, it must be enforced according to its terms.").  When interpreting a statute, the court must presume that "Congress . . . used words according to their ordinary meaning unless a different use is clearly indicated."  *U.S. v. Tracy*, 456 Fed. App'x 267, 270 (4th Cir. 2011).  Further, in accordance with the principle of statutory construction *noscitur a sociis*, it must resolve the meaning of statutory phrases by referring to the surrounding text.  *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 345 (4th Cir. 2008) (applying maxim that "a word is known by the company it keeps").

Here, contrary to Plaintiffs' contention, § 1681k(a)(2) does *not* regulate all types of information.  By its plain terms, § 1681k(a)(2) applies only "whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is

---

[5] As explained above, this theory is found nowhere in Plaintiffs' Complaint.  It was not until shortly before the close of Phase I discovery that Plaintiffs' counsel first indicated that they intended to argue this novel theory.  It is our understanding that Plaintiffs' argument is that because information such as social security number and address information is not reported with the criminal history record, it is somehow not "complete."

reported."  15 U.S.C. § 1681k(a)(2).  Thus, the clear and unambiguous language limits §

1681k(a) to information:  (1) actually *in* the public record; (2) that the CRA decides to report;

and (3) that is likely negatively to affect a prospective employer's decision as to a consumer's

employability.  "[I]tems of public record relating to arrests, indictments, convictions, suits, tax

liens, and outstanding judgments" reported by a CRA fit this description.  *Id.*

The section requires a CRA to maintain "strict procedures" to ensure that *each such item*

*that it reports* is "complete and up to date."  *Id.*  Although the section does not define

"complete," the plain language, normal definition, and surrounding text all indicate that a CRA

should maintain strict procedures to ensure that when reporting criminal history information, a

CRA reports the necessary steps regarding each item, including the full disposition of each

matter that it reports.  The dictionary defines "complete" as "having all necessary parts,

elements, or steps."  *See* Merriam-Webster Dictionary, http://www.merriam-webster.com/

dictionary/complete.  The FCRA does not clearly indicate a different meaning.

Further, it is clear from other sections of the FCRA that "complete" does not mean

"accurate."  The Court should interpret § 1681k(a)(2) in a way that makes it consistent with other

sections of the FCRA and in a manner that gives effect to all of its provisions.  *See Henslee v.*

*Keller*, 681 F.3d 538, 542 (4th Cir. 2012) (recognizing rule of statutory construction that courts

must look to the "statute as a whole" and the overall "statutory scheme").  In § 1681e(b), the

FCRA specifically requires that, "[w]henever a consumer reporting agency prepares a consumer

report it shall follow reasonable procedures to assure *maximum possible accuracy of the*

*information concerning the individual about whom the report relates*."  15 U.S.C. § 1681e(b)

(emphasis added).  Thus, consistent with § 1681e(b), § 1681k(a)(2) does not require a CRA to

ensure that the information that it reports is *accurate* with respect to a particular consumer.[6] Accordingly, the allegation (although not specifically plead) that the criminal history information that was reported did not contain social security numbers or address information, has nothing to do with the completeness of the criminal charges, convictions, etc., that are regulated by § 1681k(a).

Case law supports this plain meaning of § 1681k(a).  In *Haro v. Shilo Inn, Bend LLC*, No. 08-6306,  2009 WL 2252105, at *3 (D. Ore. July 27, 2009), for example, a CRA obtained the plaintiff's criminal history from Oregon's online public record repository, the Oregon Judicial Information Network ("OJIN").  The plaintiff argued that the CRA failed to satisfy § 1681k(a)(2) because "it did not provide the reason for dismissal of the [reported] charge against him."  *Id.* The court rejected plaintiff's argument.  First, the court found a fact question as to whether the "nature of the charge. . . would adversely affect plaintiff's ability to obtain employment so as to trigger the notification requirement."  However, because there was no evidence that the "information obtained from OJIN was inaccurate or incomplete *by omitting final disposition of the charge*," the court dismissed plaintiff's § 1681k(a) claim.  *Id.* (emphasis added); *see also Henson v. CSC Credit Servs.*, 29 F.3d 280, 285 (7th Cir. 1994) ("[C]redit reporting agency is not liable under the FCRA for reporting inaccurate information obtained from a court's Judgment Docket, absent prior notice from the consumer that the information may be inaccurate.").

Similarly, in *Baker v. Capital One Bank*, No. 04-1192, 2006 WL 173668, at *3 (D. Ariz. Jan. 24, 2006), a consumer challenged defendants' failure to report her credit limit under § 1681s-2(b)(1), which provides:  "After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness *or* accuracy of any information provided by a

---

[6] Notably, the FCRA does not impose a strict liability standard, which essentially is what Plaintiffs seek through their rewrite of § 1681k(a).  *See Moore*, 2013 WL 1662959, at *6 ("it is axiomatic that the FCRA is not a strict liability statute").

person to a consumer reporting agency, the person shall -- (A) conduct an investigation with respect to the disputed information. . . ." 15 U.S.C. § 1681s-2(b)(1). In a detailed analysis, the court rejected plaintiff's limitless definition of "completeness" and emphasized that, because the statute explicitly required the reporting of other information (but *not* a consumer's credit limit), it could infer that the statute did not require inclusion of plaintiff's credit limit:

> "Completeness," as required by [the FCRA], must have boundaries; the determination of what is "complete" must be made with reference to some objective standard of what is generally required in creditors' reports to reporting agencies. [Plaintiff] has provided no authority and the court has found none suggesting that the statute would generally require credit limits to form a part of such reports. On the contrary, a negative inference is permissible. The statute expressly provides that creditors must report specific other information to consumer reporting agencies yet does not so mandate with respect to a consumer's credit limit.

2006 WL 173668, at *3. As in *Baker*, § 1681k(a) does *not* require Defendant to report specific information regarding the consumer such as social security numbers, addresses, or other personally identifiable information. Quite simply, under any reasonable reading of § 1681k(a) and § 1681k(a)(2), Plaintiffs' novel theory of "completeness" fails as a matter of basic statutory construction.

Finally, Plaintiffs' theory would make it *impossible* for any CRA who reports criminal information to comply with § 1681k(a)(2). If § 1681k(a)(2) required CRAs to report social security numbers and other information demanded by Plaintiffs, all CRAs would be forced to comply with § 1681k(a)(1). Section 1681k(a)(2) would be rendered meaningless. This result violates the "well settled cannon of statutory construction that a statute should be interpreted so as not to render one part inoperative." *U.S. v. Johnson*, 325 F.3d 205, 209 (4th Cir. 2003); *see also Wilson v. Flaherty*, 689 F.3d 332, 337 (4th Cir. 2012) (rejecting proposed interpretation of statute that effectively would "read out" certain statutory language).

In sum, Defendant simply cannot be liable under § 1681k(a) based on a theory of

"completeness" wrongly focused on the "accuracy" of the information reported.[7]  By its plain

terms, that section required Defendant only to maintain strict procedures designed to ensure that

items of public record information, that it chose to report, *and* that were "likely to have an

adverse effect upon a consumer's ability to obtain employment," were complete and up to date.

Defendant indisputably did so here.

   **B.    The Legislative History Confirms That § 1681k(a) Only Requires
           CRAs To Report "Complete" Information About Items Likely To
           Have An Adverse Effect On Employment.**

The language of § 1681k is not ambiguous, and the Court may reject Plaintiffs' theory

based on the plain language alone.  Defendant's plain-meaning interpretation of § 1681k(a),

however, additionally is supported by the legislative history of the FCRA.

Even where the language is clear, the court can review legislative history to inform its

interpretation of the statute.  *See Russell v. Absolute Coll. Servs., Inc.*, 763 F.3d 385 (4th Cir.

2014) (where express language of FDCPA was clear, legislative history regarding the purpose of

the FDCPA's remedial scheme was consistent with statutory language); *Circuit City Stores, Inc.*

*v. OfficeMax, Inc.,* 949 F. Supp. 409, 412 (E.D. Va. 1996) (Payne, J.) (legislative history of the

Dilution Act supported that Congress intended the Act to cover dilution through tarnishment).

The FCRA was first introduced in Congress in 1969 to address concerns about the third-

party reporting of public record information.  When Senator Proxmire introduced his version, S.

823, on January 31, 1969, he noted a concern that credit reporting agencies would report arrests,

judgments, liens, and bankruptcies without reporting the dismissal of suits, reversal of

---

[7] Defendant anticipates that Plaintiffs will also argue that Witt's report did not include the
"complete" public record because the report did not identify the race of the individual in the
underlying records. This again goes to accuracy, not completeness. There is no dispute, however,
that Witt's race was never disclosed to Defendant at the time Witt's prospective employer
requested HR Plus to prepare a background report on Witt.  (Stipulated Facts ¶ 34).  More
importantly, Witt's race is not an item of information "likely to have an adverse effect upon [her]
ability to obtain employment."  15 U.S.C. § 1681k(a).

judgments, or settlements outside of court.  117 Cong. Rec. S1164 (daily ed. Jan. 31, 1969)

(statement of Sen. William Proxmire) (attached as Exhibit 2).  Similarly, in a statement to the

Committee on Bankruptcy and Currency on S. 823 on May 20, 1969, Alan F. Westin, Professor

of Public Law and Government at Columbia University, stated:

> [the credit reporting system] displays serious flaws in obtaining and recording
> information about arrests that lead to dismissed charges or even expunged police
> records because of unjustified arrest; or about lawsuits settled out of court; or
> suits that represented only pressure in a bargaining situation; or convictions
> reversed on appeal in a higher court.

*See* Fair Credit Reporting:  Hearings before the Subcomm. on Financial Institutions of the Senate

Comm. on Banking and Currency, 91st Cong. 93 (1969) (attached as Exhibit 3).

Other remarks about the "completeness" of public record information in the

Congressional record make clear that Congress's concerns related to the failure of CRAs to

report the final disposition of matters.  *See, e.g.,* S. Rep. No. 91-517, at 4 (1969) (noting that

public record information is not always kept up to date because it is costly or because the correct

information is not available) (attached as Exhibit 4); 117 Cong. Rec. E5072 (daily ed. May 25,

1971) (remarks of Representative Sullivan following the enactment of the FCRA notes errors

due to incomplete information being reported, including that dismissal of charges or suits are

often not reported, leaving arrests and filing of lawsuits on the record) (attached as Exhibit 5).

Thus, as evidenced by the Congressional record, Congress designed the FCRA to address

the reporting of public record information that did not include potentially favorable dispositions

of arrests, lawsuits, and other similar findings.  Congress did *not* consider public record

information "incomplete" due to a CRA not including a social security number or other

identifying information.  By requiring CRAs to report "complete" information, Congress simply

wanted CRAs to report the full disposition of each item of public record information they chose

to report.  Such a reading is consistent with the text as written.

Further, Congress anticipated that, given the high cost and burden of § 1681k(a)(1)'s notice requirement, CRAs would largely comply with § 1681k(a) by fulfilling § 1681(k)(a)(2). The original bill of the FCRA, S. 823, did not include language allowing CRAs to maintain strict procedures as an alternative to providing notice to individuals that adverse information was going to be reported.  Rather, the original version of S. 823 required CRAs to:

> notify promptly any individual whenever information which is a matter of public record is obtained by the agency and which is, or is likely to be interpreted by the agency or its clients as, adverse to the credit rating of the individual, and to provide a reasonable opportunity to the individual to submit an explanatory statement with respect thereto.

117 Cong. Rec. S1168 (daily ed. Jan. 31, 1969) (statement of Sen. William Proxmire) (attached as Exhibit 2).  When the Subcommittee on Financial Institutions held hearings on the bill, it heard testimony that the notification requirement was impractical and costly.  *See* Hearings before the Subcomm. on Financial Institutions of the Senate Comm., on Banking and Currency, 91st Cong. 174 (1969) (W. Lee Burge, President of the Retail Credit Co., testified that the requirement was impractical because of the hundreds of thousands of notifications a month that would be sent out by his company alone) (attached as Exhibit 3).

Paul Prietsch, President of Hale-Prietsch Services, Inc., a CRA, testified that the notification to thousands of persons a year who are mentioned in public records and publications of adverse information reported against them would put them out of business.  *Id.* at 240, 243-247.  Senator Proxmire expressed sympathy, noting that the current wording may be an "exceedingly heavy burden."  *Id.* at 246.  Indeed, when the Committee on Banking and Currency reported the bill to the Senate, Senator Proxmire stated that the Committee was "finally convinced that [the notification requirement] would involve so much expense and so much difficulty for the credit agencies that they had a legitimate complaint about it."  117 Cong. Rec. S13908 (daily ed. Nov. 6, 1969) (statement of Sen. William Proxmire) (attached as Exhibit 6).

Thus, the Committee revised the language to require notification to consumers when public record information is reported to users of consumer reports, *or* the maintenance of strict procedures designed to insure the reported information is complete and up to date.

Congress knew that notifying consumers under § 1681k(a)(1) was so costly and burdensome that some CRAs would choose to comply by maintaining strict procedures as an alternative.  It belies logic that Congress would have provided this alternative avenue for compliance if it were not possible for CRAs to actually comply with the law, as Plaintiffs suggest.  Rather, Congress intended that CRAs would maintain strict procedures for reporting complete and up-to-date information, including the outcome and current status of public record items they choose to report.

C.     **FTC Guidance Further Demonstrates That § 1681k(a) Only Requires CRAs To Report "Complete" Information About Items Likely To Have An Adverse Effect On Employment.**

The Federal Trade Commission (FTC) also has promulgated guidance that supports the plain meaning of § 1681k(a).  Although such guidance is not mandatory, it is further support that Plaintiffs' theory does not hold water.  In its recent publication, the FTC specifically recognized that § 1681k(a)(2)'s strict procedures requirement applies only to items actually reported and which are "likely to have an adverse effect" on a consumer's employability:

> Only reported "items" must be complete and up-to-date.  This section [§ 1681k(a)(2)] requires the each "item of [public] record information" reported be complete and up to date.  For example, if the CRA reports an indictment, it must also report any dismissal or acquittal available on the public record as of the date of the report.  Similarly, if the CRA reports a conviction, it must report a reversal that has occurred on appeal.  In some cases, often at an employer's request, a report may deliberately omit data such as arrest or probation data.  *Although the report is not a 'complete' reflection of every single piece of public record information, because the requirement to report complete and up-to-date information is item-specific, the CRA complies if its report includes the current, complete, and up-to-date public record status of each individual item reported.*

40 Years of Experience With The Fair Credit Reporting Act: An FTC Staff Report With

- 29 -

Summary of Interpretations (July 2011), pp. 81-82 ("FTC Report") (emphasis added) (attached as Exhibit 7).

Consistent with both the legislative history and FTC Report, FTC staff advisory opinions also reject Plaintiffs' novel and misguided interpretation of § 1681k(a).  Two separate advisory opinions emphasize that the section is concerned with reported items likely to have an adverse effect on employment:

- Advisory Opinion to Holland (Dec. 16, 1999) (attached as Exhibit 8): "Because we read [§1681k(a)(2) as being item-specific . . . we believe the CRA complies with that provision if its report is 'complete and up to date' in the sense that it includes the current public record status of each individual item reported."

- Advisory Opinion to Allan (May 5, 1999) (attached as Exhibit 9): "[F]or example, a criminal history that indicates that a consumer has been convicted would be adverse . . . and would be covered by [§ 1681k(a)].  However, other varieties of public record might not be adverse . . . and thus would not be subject to [§ 1681k(a)]."

Consistent with the statutory text, § 1681k(a)(2) simply does not require -- as demanded by Plaintiffs -- that *all* information in the public record be reported (and even additional information *not* in the public record).  A reported item of adverse public record information (like a charge or conviction) is "complete" when it includes the final disposition reflected in the public record.  *See, e.g.*, *Haro*, 2009 WL 2252105, at *3.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court grant summary judgment in its favor on Count I of Plaintiffs' Complaint.

Date:  October 15, 2014                     Respectfully submitted,

                                            ALLIEDBARTON  SECURITY  SERVICES  LLC
                                            d/b/a/ HR PLUS

                                            By: /s/  Taron K. Murakami
                                            Taron K. Murakami  (VSB # 71307)
                                            SEYFARTH SHAW LLP
                                            975 F Street, N.W.

Washington, DC 20004
(202) 463-2400
(202) 828-5393 (facsimile)
tmurakami@seyfarth.com

David J. Rowland (admitted *pro hac vice*)
Pamela Q. Devata (admitted *pro hac vice*)
Jennifer A. Riley (admitted *pro hac vice*)
John W. Drury (admitted *pro hac vice*)
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois  60603-5577
(312) 460-5000
(312) 460-7000 (facsimile)
drowland@seyfarth.com
pdevata@seyfarth.com
jdrury@seyfarth.com

Frederick T. Smith (admitted *pro hac vice*)
SEYFARTH SHAW LLP
1075 Peachtree Street N.E., Suite 2500
Atlanta, Georgia  30309-3962
(404) 885-1500
(404) 892-7056 (facsimile)
fsmith@seyfarth.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2014, I caused a copy of Defendant's Memorandum Of Law in Support of Its Motion for Summary Judgment on Count I of Plaintiffs' Complaint to be electronically filed with the Court's CM/ECF system, which will send notification of such filing to the following:

Casey Shannon Nash
Matthew James Erausquin
Consumer Litigation Associates PC
1800 Diagonal Rd, Suite 600
Alexandria, VA  22314

Dale Pittman
The Law Office of Dale W. Pittman, P.C.
112-A W. Tabb Street
Petersburg, VA  23803-3212
dale@pittmanlawoffice.com

Leonard A. Bennett
Susan Mary Rotkis
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, VA 23601
lenbennett@clalegal.com
srotkis@clalegal.com

Jeremiah A. Denton, III
477 Viking Drive, Suite 100
Virginia Beach, Virginia 23452
jerry@jeremiahdenton.com

/s/ Taron K.  Murakami
Taron K. Murakami  (VSB # 71307)
SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, DC 20004
(202) 463-2400
(202) 828-5393 (facsimile)
tmurakami@seyfarth.com
*Attorney for Defendant*